UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

RAYMOND E. RIPPEE                                                                                    PLAINTIFF

       VS.                                      Civil No. 2:14-cv-2133-MEF

CAROLYN W. COLVIN, Commissioner,                                              DEFENDANT
Social Security Administration

### MEMORANDUM OPINION

    Plaintiff, Raymond E. Rippee, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382c(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.   Procedural Background:

    Plaintiff filed his application for SSI on March 12, 2012, alleging an onset date of May 5, 2009, due to a neck and spinal injury from a car accident and COPD. (T. 115-116, 151) Plaintiff's application was denied initially and on reconsideration. (T. 43-46, 52-53) Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Hon. Ronald L. Burton, on November 5, 2012. Plaintiff was present and represented by counsel.

    At the time of the hearing, Plaintiff was 51 years of age and had the equivalent of a high school education. (T. 25, 120) His past relevant work experience included working as a transporter from 2007 to 2009 and a security guard from 2006 to 2007. (T. 32, 121)

    On May 23, 2013, the ALJ found Plaintiff's degenerative disc disease of the cervical and lumbar spine and chronic obstructive pulmonary disease ("COPD") severe, because singly or in

1

combination they imposed more than a minimal limitation on the Plaintiff's ability to perform basic work activities. (T. 12) Considering the Plaintiff's age, education, work experience, and the residual functional capacity ("RFC") based upon all of his impairments, the ALJ concluded Plaintiff was not disabled from March 12, 2012, through the date of his Decision issued May 23, 2013. The ALJ determined Plaintiff had the RFC to perform a full range of light work. (T. 13)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on April 24, 2014. (T. 1-4) Plaintiff then filed this action on June 10, 2014. (Doc. 1) This case is before the undersigned pursuant to consent of the parties. (Doc. 7) Both parties have filed briefs, and the case is ready for decision. (Doc. 12 and 13)

## II.   **Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Asture,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th Cir. 2003).   The Court considers the evidence that "supports as well as detracts from the Commissioner's decision, and we will not reverse simply because some evidence may support the opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions

represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel,* 221 F.3d at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the plaintiff has demonstrated he is unable to perform either his past relevant work, or any other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.945. The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for DIB and SSI benefits: (1) whether the plaintiff has engaged in substantial gainful activity since filing his or her claim; (2) whether the plaintiff has a severe physical and/or mental impairment of combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the plaintiff from doing past relevant work; and, (5) whether the plaintiff is able to perform other work in the national economy given his or her age, education and experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or

her residual functional capacity. *See McCoy v. Schweiker,* 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff had not been disabled from March 12, 2012, through the date of the ALJ's Decision on May 23, 2013. Plaintiff raises three issues on appeal, which can be summarized as: (A) the ALJ erred in his determination of the severity of Plaintiff's impairments; (B) the ALJ erred in his RFC determination; and, (C) the ALJ erred at step four of his analysis when he determined Plaintiff could perform past relevant work. (Doc. 12, pp. 7-14)

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and are repeated here only to the extent necessary.

### RFC determination:

Plaintiff argues that the ALJ's RFC determination, concluding Plaintiff could perform a full range of light work, was not supported by substantial evidence. (Doc. 11, pp. 11) The Court agrees.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009); *see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations

resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).

Plaintiff was injured in a motor vehicle accident on May 5, 2009, when his vehicle was hit from behind. Plaintiff sought treatment from Dr. William Knubley, neurologist at Cooper Clinic. Dr. Knubley noted Plaintiff had a normal motor examination, however Plaintiff's sensory examination revealed a very nonphysiologic sensory response. Plaintiff had pressure sense with no pain until the upper thighs, however he had no pressure sense throughout the entire back region and a similar sensation in the arms. Dr. Knubley noted Plaintiff had preserved vibration in the upper and lower extremities. (T. 178) Plaintiff had normal coordination, gait, and heel and toe walking, however he had slight difficulty with tandem. (T. 178) Dr. Knubley noted Plaintiff's neck was supple and he had obvious discomfort in the back of the scalp area, but no loss of sensation extending to the base of the skull in to the neck area and the parascapular and trapezius region. (T. 178-179) Dr. Knubley noted Plaintiff had very good range of motion. (T. 179)

Dr. Knubley opined Plaintiff's condition was status post repair from a recent motor vehicle accident with associated whip lash, back, and minor concussive like injuries with associated symptoms: crackling in the neck, neck and shoulder pain, decreased attention span, fatigue, prescapular pain, leg cramps, paresthesias in the hands and legs, lightheadedness, insomnia, low back pain, tinnitus, and headaches. (T. 179) Dr. Knubley's recommendations included obtaining a magnetic resonance imagining ("MRI") of the head and neck, Electromyography ("EMG") of the upper extremities for carpal tunnel syndrome, and being placed off work for two weeks until he could be assessed. Plaintiff was prescribed Amitriptyline, Flexeril, Flector patches, splints at night for his carpal tunnel syndrome, two Aleve twice a day, and after the MRI evaluation begin physical therapy. (T. 179)

On May 27, 2009, Dr. Knubley observed that the EMG showed mild carpal tunnel changes, particularly on the left and prescribed splints. The MRI of the brain was normal, however the MRI of the neck showed a central to later disc protrusion at the C6-7 level on the left with some canal stenosis. (T. 173)

Upon examination, Dr. Knubley observed Plaintiff was awake, alert, and oriented. He had no localizing cranial nerve changes, fairly symmetric reflexes in the upper extremities, and his leg and arm strength were good. (T. 173) His examination looked very much the same as it did two weeks ago. Dr. Knubley's impression was Plaintiff had neck and shoulder pain with associated lower extremity and possibly some upper extremity symptoms. He noted some of the symptoms could be carpal tunnel syndrome, and there were subtle changes that could implicate some possible traction injury at the C6-7 level on his disc protrusion. Dr. Knubley believed the disc protrusion could have been contributing to a lot of his neck and parascapular pain. (T. 173) Dr. Knubley's plan included an examination by a neurosurgeon, extend his work release, and for Plaintiff to obtain "gentle" physiotherapy, with no manipulation, traction, or vigorous things, rather just localized heat ultrasound, minor massage in the neck and back region twice a week to see if it would help. (T. 173)

On June 1, 2009, Dr. Joseph Queeney, neurosurgeon, performed an evaluation to determine whether Plaintiff needed cervical spinal surgery. (T. 295) Plaintiff indicated his paraesthesias came and went and was exacerbated by all activity, however it was relieved with rest. Plaintiff indicated physical therapy did not help. (T. 295) Upon examination, Dr. Queeney observed Plaintiff exhibited a poor effort with testing of his grip. (T. 296) Plaintiff's sensation to temperature and pinprick were diffusely diminished in the upper extremities from the shoulders distally bilaterally. While Plaintiff had sensation on the left side over his trapezius, it was absent on the right side.

Plaintiff also did not have pinprick over the right neck, the right mandible, or the right maxilla, however, he did have pinprick over the right forehead. Dr. Queeney opined it was a nonphysiologic finding and he was concerned that in conjunction with a poor effort of his grip, it was an example of symptom magnification. (T. 296) After reviewing the plain films, Dr. Queeney did not see any evidence of any significant arthritic changes. Dr. Queeney opined, after he reviewed the MRI of the cervical spine, Plaintiff had a very tiny central disc protrusion at C6-7. While it was causing some contact with the spinal cord, Dr. Queeney did not see any deformity of the spinal cord. (T. 296) Dr. Queeney believed Plaintiff would not get better following an anterior cervical discectomy at C6-7 and he could follow up with one of his physicians for conservative treatment. (T. 296)

Plaintiff continued to pursue treatment for his neck and back pain at Good Samarian Clinic from July 2010 until July 2012. While receiving treatment, Plaintiff complained the pain between his shoulder blades and the pain felt like "pins and needles" in his legs and left arm. (T. 431) Even though Plaintiff stated Tramadol helped, he continued to have pain and sought treatment for his neck and back pain. (T. 357, 361, 431)

Dr. Chester Lawrence Carlson performed a general physical examination of the Plaintiff on April 4, 2012, at the agency's request. Dr. Carlson noted Plaintiff had a neck and spinal injury from May of 2009, COPD, and decreased hearing. (T. 399) Plaintiff indicated he had depression, however, Dr. Carlson noted he was not seeing a doctor, nor had he been hospitalized. (T. 400) Upon physical examination, Plaintiff's ears, neck, head, abdomen, and skin changes were all within normal limits, however he observed mild wheezing in his lungs. (T. 401) Dr. Carlson noted Plaintiff had a normal range of motion in his neck, shoulders, elbows, wrists, hands, hips, knees, and ankles, however he had limitations in his cervical and lumbar spine. (T. 401)

Plaintiff had muscle spasms in his lumbar spine and a positive straight leg raise at 50 degrees in both legs. (T. 402) Dr. Carlson observed Plaintiff had normal reflexes of his biceps, triceps, patellar, and Achilles tendon; he had normal strength and no muscle atrophy or sensory abnormalities. (T. 402) Plaintiff was able to hold a pen and write, touch fingertips to palm, oppose thumb to fingers, pick up a coin, stand and walk without assistive devices, walk on heal and toes, squat and arise from a squatting position, and he had a normal grip strength in both hands, however he did have a mild antalgic gait. (T. 402) Dr. Carlson opined Plaintiff had moderate to severe limitations in prolonged activities secondary to COPD, mild to moderate limitations in bending, squatting, lifting, and walking long distances. (T. 403)

The ALJ determined Plaintiff could perform a full range of light work, meaning he could lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted m[ight] be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

While the Court is aware Dr. Queeney's examination notes indicated he was concerned with Plaintiff's symptom magnification, Plaintiff continued to complain of pain and sought treatment for his neck and back. (T. 357, 361, 431) The Court is concerned with the ALJ giving substantial weight to part of Dr. Carlson's physical examination and no weight to other aspects, particularly Plaintiff's COPD limitations. Moreover, the ALJ noted he took into consideration Dr. Carlson's recommendations as to postural limitations on bending, squatting, lifting, and walking long distances, yet there was no mention any postural limitations in Plaintiff's RFC.

The ALJ noted his RFC determination took into consideration all symptoms, objective medical evidence, and opinion evidence. (T. 13) The ALJ disregarded the following evidence: the opinion

8

of Dr. Patricia McCarron, consultative examiner; the medical records from Good Samaritan Clinic; part of Dr. Carlson's examination report; and, Plaintiff's testimony and his function report. (T. 15) The ALJ discredited Plaintiff by stating his treatment was conservative, however, this appears to have been the only treatment left to Plaintiff since surgery was not recommended.

In order for the ALJ to have made an informed decision regarding Plaintiff's limitations and restrictions, a physical RFC from Plaintiff's treating physician, Dr. Knubley, should have been ordered. This would have given the ALJ sufficient evidence to have made an informed decision regarding Plaintiff's limitations and restrictions. See *Gasaway v. Apfel*, 187 F.3d 840, 842 (8th Cir. 1999); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) ("[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." (citation and internal quotes omitted)).

Next, Plaintiff asserts the ALJ erred in his RFC determination regarding Plaintiff's COPD. (Doc. 12, pp. 10) The medical records indicated Plaintiff was prescribed Albuterol and Flovent for his COPD. (T. 356, 359) On June 3, 2011, Plaintiff complained of a productive cough with wheezing and distant sounds and was prescribed Prednisone and Ventolin. (T. 368) On May 10, 2012, Plaintiff's COPD had worsened, and the doctor at Good Samaritan Clinic prescribed Symbicort. (T. 432) Plaintiff had two pulmonary function studies performed, at the Commissioner's request, however the record is devoid of the interpretation of the results. (T. 378-381, 383-386)

Doctors Patricia McCarron, Jonathan Norcross, Bill F. Payne and Chester Carlson, all state agency medical consultants, recommended some form of limitation regarding Plaintiff's COPD in each of their assessments. (T. 394, 395, 403, 425) However, the ALJ determined Plaintiff's COPD was controlled by medication, and he discounted part of Dr. Carlson's opinion stating "he only

9

saw the claimant one time, and his opinion is not fully consistent with the treatment records from Good Samaritan or with the findings from Arturo Mead, MD, who performed the pulmonary consultative examination." (T. 16) The ALJ gave great weight to part of Dr. Carlson's opinion that fit the ALJ's RFC determination for Plaintiff's limitations regarding his degenerative disc disease, however, discounted the COPD aspect of Dr. Carlson's opinion by stating it was not consistent with the findings of Dr. Arturo Mead, who performed the pulmonary function studies.

Plaintiff's COPD pulmonary function tests were never interpreted by a doctor, rather the ALJ took it upon himself to interpret the studies. In the Court's view, the ALJ interpreting Dr. Mead's tests, instead of seeking clarification or additional information regarding the significance of the test results, is tantamount to the ALJ "playing doctor" and remand is necessary. *See Pate-Fires v. Astrue*, 564 F. 3d 935, 946-947 (8th Cir. 2009), citing *Rohan v. Chater*, 98 F. 3d 966 (7th Cir. 1996) ("ALJ's must not succumb to the temptation to play doctor and make their own medical findings").

The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) Therefore, a claimant's RFC assessment "must be based on medical evidence that addresses the claimant's ability to function in the workplace." "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Instead, the ALJ should seek opinions from a claimant's treating physicians or from consultative examiners regarding the claimant's mental and physical RFC. *Id.*; *Strongson v. Barnhart,* 361 F. 3d 1066, 1070 (8th Cir. 2004).

Since the ALJ based part of his RFC determination on his interpretation of medical records and not the medical evidence provided, the Court finds substantial evidence does not support the

ALJ's RFC determination and remand is necessary. In order for the ALJ to make an informed decision regarding Plaintiff's RFC, the ALJ is directed to obtain a physical RFC, preferably from Dr. Knubley, or another neurologist, detailing Plaintiff's limitations and restrictions regarding his back. Further, the ALJ is to obtain Dr. Mead's, or another pulmonologist's, interpretation of the pulmonary function studies. Once the ALJ has received the results of the studies and RFC from the doctors, he can better assess how the Plaintiff's degenerative disc disease and COPD affect his RFC.

Moreover, the ALJ should consider whether Plaintiff's tinnitus and weakness, numbness, and tingling in his upper extremities were severe. Plaintiff's tinnitus was diagnosed by an otolaryngologist in October 2009, and he continued to complain about it throughout his medical treatment. (T. 183, 293) As for Plaintiff's complaints regarding the weakness, numbness, and tingling in his upper extremities, Plaintiff's EMG showed mild carpal tunnel changes, particularly on the left, and he had to wear splints. (T. 173) The record is replete with documented complaints regarding Plaintiff's weakness and tenderness in his left upper extremities. (T. 357, 431, 432) Thus, the ALJ should consider whether Plaintiff's tinnitus and weakness, numbness, and tingling in his upper extremities imposed more than a minimal limitation on the Plaintiff's ability to perform basic work activities and incorporate his findings into the Plaintiff's RFC.

### IV. Conclusion:

Based on the foregoing, I must reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

Dated this 18th day of June, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE